Good morning, Your Honors. May it please the Court, Ray Salentik on behalf of Plaintiffs' Appellants Ali Alavi and the A. Legacy Foundation. I'd like to reserve three minutes of my time for rebuttal. I'll try to keep track of that, but please keep track on your own as well. Of course, Your Honor. Thank you to the Court for hearing oral argument today. I understand that the Court wants to hear about this Court's recent decision in Facebook, and I will certainly address that. I wanted to just make a few preliminary remarks to help orient that conversation. To begin, a number of things are not at issue on this appeal. For instance, falsity, as the three statements have already been conceded. The defendants have conceded that they made a materially false statement about the company's premier broadcast airing schedule of Rainbow Rangers. They've also conceded that they disseminated a false statement about whether the company was going to be sold to Netflix or Disney. Now, they published that on their Twitter account. It was a third-party analyst that said it. They published it. They disseminated it. At that point, they became liable for it, and they did not dispute that. The third statement is they did not challenge the district court's finding that the Arnold Schwarzenegger statements were misleading. So in the securities fraud case, we already have three statements that are conceded to have been false. Now, Sienter is a landslide in plaintiff's favor, and I wasn't planning to talk about it unless the Court has specific questions. Actually, if you can go to – I do have a question about the Rainbow Rangers statement. Can you tell me when the truth became known about the Rainbow Rangers misstatement? I mean, can you tell me what that is? Certainly, Your Honor. On June 5th, a well-known short seller called the Hindenburg Report published a detailed report on Genius, and it said that Rainbow Rangers is not airing 26 times per week. It was only airing nine times per week. So you're indicating that that's what the truth became known at that point when the Hindenburg Report came out. That's correct, Your Honor. But how do you answer the question or the issue that we have to face, which is that weren't all of those statements public? No, Your Honor. Below, we disputed that the report was based on public information. Well, hold on. The misstatement, I think, that you're pointing to is the fact that Rainbow Rangers aired some 26 times, and the report indicates that it actually – and by the way, that it aired 26 times, I think, on March, right? That's correct, on March 17th and March 20th, which was also false. But it actually – the report talks about June disclosures, correct? That's correct, but at no point in between did it ever air 26 times, Your Honor. When the statement was made, plaintiffs submitted evidence that it was only airing between 12 to 14 times. But that information, though, where was that information gotten from? That was in investigating the complaint, Your Honor. Right, but where did the – well, in investigating that complaint, but where was that information, the information about the number of times that that aired? It was found on the Nickelodeon website and then a broadcasting schedule. Why isn't that just public information that's already out there? Well, Your Honor, because it – to put in perspective how many statements the company made, in a very short period of time they issued 60 press releases, they were penning shareholder letters. There was just an avalanche of information that they were disseminating to the market, some of which was false. Now, under Ninth Circuit law, investors are not required to site check a statement by a CEO. They can rely on the statement. So it was in public because it was contrary. The public statement by Genius was that it aired 26 times per week, and that's the statement that the market digested at that time. No, but the information has to be somehow hidden. The idea is that this information is hidden and now suddenly released, right, released out into the open. But if the information is already out there in the public, i.e., the number of times that it actually aired, then how is then this under our current case law, you know, the truth became known and therefore establishing the problem that you've indicated? Well, a couple of things, Your Honor. First is that is a truth-on-the-market defense, that the market transmitted the information at the same time that the false statement was made, and that is inherently factual. And again, we are at the very early pleading stage, so that is not an issue that should be resolved, certainly not in defendant's favor at the pleading stage. So that's the first thing, is whether or not it was public is itself a factual issue. And under Ninth Circuit law, the information that was withheld has to be transmitted with the same degree of intensity and credibility as the false statements. Under NECTAR, which was decided in 22, it cannot be a violation if the information is entirely public. Also, Facebook reiterated that in its case, said both of those things. So we have NECTAR and we have Facebook both saying those. With regards to, again, I'm just talking about the Rainbow Rangers statement. Sure, and again, it was disputed below that that information was public. So that would be a factual issue, and that distinguishes us from NECTAR because in NECTAR it was not disputed that it was public information. So that would be one factor. I gather when you say it's disputed, the question is, what's the nature of public? Because I don't think it was secret in the sense that if somebody really knew to dig in, the programming schedules were probably available. So you're arguing it's not public within the meaning of the doctrine? Within the meaning of the federal security laws, that's correct, Your Honor. So that's the argument. Yes.  I'm sorry. Go ahead. I'm sorry. I was just going to say, and we know it wasn't public because under Supreme Court presumptions of how the market prices in information, public information is digested by the market. And so when this information was revealed by the Hindenburg Report, genius stock fell 13%. So if it was already public, it wouldn't have fallen. And that's well-settled presumptions that the market already digests public information. So something made it fall 13%. Plaintiffs allege it was the revelation of the previous false statement. And that controls. Any factual dispute can be resolved later in the case. But at the pleading stage, plaintiffs' allegations control. And then it falls again substantially on June 8 and June 9 when Genius itself says, hey, wait a minute, it didn't air the way we said. That's correct, Your Honor. And Genius on the 8th, so three days later, didn't either admit or fail to dispute what was in the Hindenburg Report. Is that correct? That's correct, Your Honor. And they also misleadingly characterized the disclosure because they said it had been scaled back, which almost suggested to investors that at some point between their false statement in March and in June that there was a change of circumstances. But as we've already discussed, when they made the statement at the time, it was already less than half of the airing frequency that they said that it was. And is that what you're alleging is the corrective disclosure then? Is the Hindenburg Report? No, on June 8th, the Genius response. That would be a confirmation of the June 5th corrective disclosure. And to address your point, Your Honor, about Facebook, another point that Facebook made is that at the very early pleading stage, it's typically inappropriate to resolve loss causation issues, which is what we're talking about, particularly those that involve factual disputes, such as whether information was public, which is inherent. Was that a finding of the court, or was that dicta? I'm curious your take on that. Because, I mean, is that getting to what is required under our normal pleading standards, or is that specific to these kinds of cases? I mean, I think there's a distinction, isn't there? I agree there's a distinction. And I would say that regardless of the pleading standard that's applied, it is still inappropriate to resolve whether a loss cause – typically inappropriate to resolve at the pleading stage whether a loss causation has been adequately alleged. And that's a principle that was stated by this court initially in Gilead, which applied both Rule 8 and 9B, which tells you that it's not a – it doesn't turn on the pleading standard. That's just a well-settled principle that recognizes how inherently factual the inquiry is on loss causation and really trying to determine whether a particular stock drop was tied to a misrepresentation and caused an investor's loss. And another point I'd like to make about factual issues is on – if we can move on from the Rainbow Ranger statement, unless there's any other questions on that, is the Insider Financial Report. And that is inherently factual, the loss causation inquiry there, because on June 22nd, the company, as I mentioned, disseminated a false statement that said it's only a matter of time before the company is going to be sold to Netflix or Disney. Now, on July 2nd, the company came out and said, we have a key business development update. The market at that point – and this is known by – in the second amendment complaint, we alleged specific market participants who were recounting their impressions of the likelihood of a sale being announced. And the market had understood that, that it was just a matter of time. And so on July 6th, when no sale came, Genius Stock crashed 25 percent. And then market participants, which were alleged with the who, what, when, where, were recounting their impressions of what that meant, what their perceptions were. And there you're saying that the truth became known then on June 2nd? Is that what you're saying? I'm saying on July 6th. July 6th, I'm sorry. Is that what you're saying, that that's when the truth became known? Because there would be no sale. That's correct, Your Honor. But even though there's no affirmative information that's come out, there's nothing that comes out indicating that the sale is not going to happen. You're indicating that not having a statement out there is sufficient. When the market perceives as much. And so in this case, that's been pled with particularity, and we've alleged specific market participants that recounted their impressions of what the news was released. And logically, a company that's going to promise, oh, it's just a matter of time before we're going to be sold, if they keep promising that, of course it's going to be something other than a confession that they're not going to be sold. Are we ever going to set a rule to establish what the market believes and doesn't believe? I mean, are we going to surmise that from when the price goes up or down? I mean, how do we set a rule for that? Well, I think the rule is that it's typically a factual issue because you hit the nail on the head, Your Honor. It's not something that can easily be resolved on the pleadings. It's something that a fact finder should determine. And that's what this court said in Gilead, and that was repeated in Facebook. And I would like to reserve the remainder of my time for rebuttal. Very well. Thank you. Thank you. Morris Carson. Thank you, Your Honor. Michael Charlson of Vincent & Elkins for the Defendant Appellees, Genius Brands International. Its CEO, Andy Hayward, and CFO, Robert Denton. I'm going to refer to the Defendant Appellees collectively as Genius at times, but I should note that the company formally changed its name recently to Cartoon Studios, Inc. I will likewise address the issues of Facebook and its potential impact on this case, but I also want to present a couple of preliminary comments and respond to my opponent's assertion that we've conceded everything. Judge Fisher's decision to dismiss this complaint was plainly correct. The pleading is an archetype of the throw-it-against-the-wall-and-see-what-sticks kind of complaint that the Private Securities Litigation Reform Act prohibits. It does not state a Section 10b misstatement claim, and it does not state a scheme claim either, and that determination should be affirmed. Now, Facebook largely, but not exclusively, dealt with the pleading of loss causation, and that's important. It's an essential element of a 10b claim. But it is not the only essential element of a 10b claim. Typically the district court in numerous instances rely on requiring that there be an initial price increase, and that's not required under Facebook. Actually, Facebook does not modify the requirement that a plaintiff, at least to a Rule 8 standard, has to allege that there was a misstatement that caused either price inflation or price maintenance, a corrective disclosure that matches the alleged misstatement, and a price decline when that corrective disclosure was issued. And the fact that that... Just to emphasize Judge Reier's point, the district court seemed to think that the false statement was going to produce a price increase, and you just conceded that it's enough to be actionable if it causes price maintenance. If there is a corrective disclosure that... Of course, of course. But the consequence of the false statement is a bad consequence if it produces not only increase but price maintenance. And then, of course, it has to be followed by a corrective statement. I get that. But price maintenance is enough. It does not have to create a price increase. An affirmative price increase is not always required, Your Honor. No, no. I just want to emphasize what I think I heard you say. But without some sort of a price movement, there's no indication that the statement itself was at all material. For example, on the Rainbow Ranger statement, we have a lot of stuff in the record, and I will concede my own brief was a little confusing about what was happening with the price right after the March 17th release. And part of that's because we don't know when during the day it was released. But however you look at it, the price didn't move more than two cents from under a worst-case scenario. It didn't move more than two cents between March 16th and March 18th. It may have moved negatively. It may have moved positively, but no more than that. And that's what I think Judge Fisher was getting at when she said that there wasn't a meaningful increase in the price. But if the district court was looking at it under the lens of you have to show an initial price increase, and that's not really what the test is, don't we have to remand it back? No, Your Honor. I'm sorry, Your Honor. So that the standard in Facebook can be applied? The standard in Facebook, well, first of all, I would say, Your Honor, that the case is here de novo. We have a record with fulsome briefing on these issues before the court, and that remand on this particular issue would be a waste of time. You know, we just went through a discussion with the plaintiff about the Hindenburg Report. The Hindenburg Report is not a correct disclosure. It can't be a correct disclosure under Facebook because it was based on public information, and I'd refer the court to ER 277, which is the Hindenburg Report. And the Hindenburg Report, you know, to listen to plaintiffs, the Hindenburg Report was just a one-pager that said they lied in March. That's not so. This report is ten pages long. It's single-spaced. It covers all kinds of different issues. And at the very end of the report at ER 277, it says that, you know, originally the company had said that Rainbow Rangers was airing 26 times a week, and I quote, but the Rainbow Rangers schedule now says otherwise. It's not speaking about March. It's speaking about June. Most weekdays, and they look at the schedule at ontvtonight.com with extensions. This is a public website. And the plaintiffs cite in their second amended complaint a public website, nickjr.com. Anybody could have gone to those websites and figured out what the schedule actually was. So what about the June 8th statement by Genius? The June 8th statement by Genius is, first of all, the plaintiffs have never until today pointed to the June 8th statement as corrective. It was right there on the complaint. But, Your Honor, again, the June 8th statement is responsive to this entire ten-page report. It talks about all sorts of things. And this is a report by a fairly ñ But am I wrong that the market responds to the June 8th report by falling 14 percent and then the next day by 26? Let's look at the context. Am I wrong in that? It does fall, Your Honor. By 14 percent and then by 26? It does fall precipitously. Are those numbers right? You can say yes or no. Yes. No, those numbers are correct, but there's context for it. The stock price had been run up in a meme stock trading frenzy on June the 3rd. If one looks at the price chart, which we append to the ñ which is in the record at ER250, you'll see that the stock price on June the 3rd was up and down by 250 percent during the day, reaching a high of $11.73 a share that day. It closed down at, you know, like half of that. And there were no statements by Genius. There had been no statements by Genius for weeks. There had been nothing. This was all part of a meme stock, you know, up and down. Now, that downward trend continued, and indeed it continued up to and including the date of the insider trading retweet that the plaintiffs talk about. The stock price that day declined considerably. And, you know, to us, that negates loss causation. But what we have is a situation where the corrective disclosure can't be a corrective disclosure, I'm talking about the Hindenburg Report here, under the rule that Facebook just announced, because it's all public. And, indeed, it was all public all along. If people really cared about this ñ But isn't the argument that they're saying is that it's not public in the same sense, in the sense that it was sort of obscured or hidden from plain sight, if you will? I don't know what it means to obscure or hide a television schedule. You know, when I was a kid, we used to get TV Guide every week, and you knew exactly what was on TV. If you're interested in knowing what's on Nickelodeon, you look at the Nickelodeon website. Now, look, this is a head scratcher. If you look at the Facebook discussion of Cyanar, you will see that the court acknowledges that there are situations where the mere allegation that there's contrary information in the company can lead to a question about how could it have been that this statement was actually put out there incorrectly. And I would agree, that's a head scratcher. But it isn't any more than mere negligence, and it isn't enough to allege Cyanar. And this is a point that I wanted to make in an overarching sense before getting into the weeds on Rainbow Rangers. And that is that Facebook does not modify the outcome of this case for two reasons. The first is that loss causation is only one of three major elements that need to be alleged in order to state a claim for securities fraud under Section 10B, whether a misstatement claim or a scheme claim. And the other two, falsity and Cyanar, are things that were addressed in great detail by the parties, both in briefing below and briefing here. And Judge Fischer properly resolved those issues in the defendant's favor. The fact that we decided not to discuss every detail of every element of every statement is a function of the scattershot nature of the complaint that was here. We didn't concede that the June 15th Schwarzenegger press release was false. It isn't false. It says that he's going to be an investor and he's going to be, you know, a talent for a new television show and he's going to be paid with warrants, not cash. Let me ask you, since you're talking about falsity, something dealing with penny stocks. In the Form 8K, it attaches the securities purchase agreement. And in the securities purchase agreement, it says that the company hasn't paid anyone or any entity any compensation for soliciting another to purchase any other securities of the company. But wasn't Penny Stocks paid stock in January of 2020 to publish favorable information? The allegation is that the company had a relationship with Penny Stocks. The company denies that. It did have a public relations firm that it had engaged previously. I believe it was actually well before January of 2020. But doesn't the complaint allege that Penny Stocks was hired to do that? The plaintiffs allege that Penny Stocks was hired to put out promotional articles about the company. That is not the same thing as soliciting people to sell or to purchase stock. That particular line relates to laddering. Well, the U.S. Supreme Court found in Pinter v. Dahl that in the context of a Section 12A claim that there was no requirement that it has to be targeted or directed to a particular plaintiff that a general solicitation, a general mass communication constitutes solicitation. Why shouldn't we apply that same definition of solicitation in this area? Frankly, it's because the Penny Stocks narrative is completely vacuous. According to the complaint? Yes. Because we have to assume everything in the complaint is true. The complaint never alleges a single statement made by Penny Stocks that was false or misleading about Genius Brands. Never alleges one. At any time during the whole class period, there's not a single misstatement alleged. Indeed, there's not even a statement identified. But the question is whether your client lied when they said that no company was paid any compensation for solicitation, not whether what they said was true or not, but whether your client wasn't truthful in that representation. But the representation that's relevant here, Your Honor, relates to manipulation of the stock price. And the solicitation we're talking about, these are actually terms of art under Regulation M, which are representations routinely included in a private placement of securities. And the solicitation that you're referring to, Your Honor, is not a solicitation to issue articles that are favorable to the company. It's a solicitation to buyers to go out there and put in purchase orders so that the stock price goes up. Or you could, in theory, put in sell orders so that the purchase price goes down. That's the kind of manipulation that that particular representation is addressed to. And in any event, if that statement is a statement on which the court believes there could be liability, let's look at loss causation on that statement. Where is the corrective disclosure? A statement in Seeking Alpha, another short seller report in June, that says it's not that Genius Brands had retained penny stock, but that penny stocks, with all of the caveats that exist on their website, about why it is a bad idea to invest in a manner consistent with what penny stocks is urging, says it's reasonable to infer that Genius Brands or a third party might have engaged penny stocks. I want to ask you about two sets of disclosures, the Schwarzenegger disclosure and the Netflix Disney disclosure. And I'm trying to understand the other side in saying that sort of the absence of information establishes that the truth became known with regards to those two things. Because there was never some disclosure of some sort, some statement, but there's like an absence of information. That's what they're indicating. What's your response to that? My response is it's entirely unworkable. How can we possibly know? How is an issuer supposed to be able to monitor all the various chat rooms that are out there? You know, the plane spark can come in and say, well, we found this tweet where somebody speculated wildly about something that they're disappointed didn't come to pass. When the July 2nd statement was issued, it didn't say anything about a merger with Disney or Netflix. It said a major business announcement would be coming, and it did. The joint venture with Pal Entertainment was significant. It was an acquisition of an interest in the Stanley intellectual property. And, Your Honor, my time is up, I see. I'm happy to respond. I think the retweet was more specific than that. The report said, we believe it is only a matter of time before either Disney or Netflix buys Genius Brands. And that's what they retweeted. It was not sort of, there's some deal coming up. But they did not retweet, this deal is happening. What it said was. No, no, they retweeted exactly what I read. And it was the only retweeting of anything of this nature during the class period. Is that right? That's a yes or no question. And the answer is I'm not sure, but I don't believe there are any others. I will say, however, Your Honor, that the retweet said, I'm a CEO who's got your back, who's got the shareholders back. It doesn't say a deal is coming, a deal is imminent. And, indeed, I would say that those words. Wait a minute, let me reread it to you again. We believe it is only a matter of time before either Disney or Netflix buys Genius Brands International. That's what it says. Now, imminent, that may not be there. But it says only a matter of time before this purchase is made. And they retweeted. Those words were insider financials words, not Genius Brands words. I know that, but they retweeted those words. And as far as I can tell, and you're telling me you don't know, as far as I can tell, that's the only third-party report that they retweeted during the class period. That is to say it's not characteristic of them to do that. I mean, there are these third-party reports all the time, and they choose this one to retweet. I understand your point, Your Honor. However, it was retweeted not with, see this, we've got a deal coming. It was retweeted with, I'm a CEO who's got your shareholders back. And that, to me, says I'm going to make sure. Let's assume Judge Fletcher is right about that. Let's assume that that was, in fact, retweeted and that there was no other retweets of any other matter. What's next, though? What's the next thing that has to happen in order for this claim to succeed, that we have to have some corrective statement of some sort? What is there in this case? They're indicating that because you never did anything else to correct that, that that should be, and that the market reacted to that, that that should be the corrected statement, if you will. Well, they allege that, but they ignore the fact that on the front end of this thing, when that retweet occurred, the stock price dropped from $2.94 to $2.51. So there's no loss causation because there's no price inflation here. And there's no price maintenance here. And in terms of a corrective disclosure, when's the corrective disclosure period supposed to end? To this day, three and a half years after the fact, the company has never issued a statement saying, we are not merging with Disney. And it becomes completely unworkable. It is not genius's fault that other people had views about what might happen to the company from a strategic perspective or views about their own disappointment at whatever announcement the company might have made. The company is responsible for what it says. And what it said was, I'm a CEO who's got the shareholders back. The stock price goes down, which to me intimates that people say, okay, there's no deal coming. And the stock price continues to go down. And then on July 2nd, some people, other than the company, speculate about what the big business announcement might be on July the 6th. And there was a big business announcement on July the 6th. Thank you, Counselor. I think your time is up. Thank you. Thank you, Your Honor. Your Honor, there's just a few things I wanted to comment on. Counsel's concern that companies won't know when a – how are companies supposed to know when investors perceive what they're saying. Well, they lied about the sale of a company. And his comment that those were not the company's words, that was never argued below. They conceded that they adopted the statement. And there's ample case law that's cited in the briefing that when a company entangles itself, say, by tweeting it and commenting on it and advertising it with hashtags, they've entangled themselves. It's the same as the company saying, it's just a matter of time before we're going to be sold. It's by an operation of law. Now, whether the stock price went up or down on that day is irrelevant to loss causation. That's a price maintenance issue. That's a – sorry, it's a price impact issue. It's not a loss causation issue. Now, your adversary just said, well, there was anticipation that there was going to be a big business announcement on July 6th. And he says, just before he sat down, and there was one. So what's he talking about? What he's talking about is the announcement that came on July 6th. It was an announcement about certain intellectual property that the company had purportedly obtained regarding a Stan Lee. That's the Stan Lee deal. Correct. And that turns out to be false too. That's correct, Your Honor. And I just want to take a moment to point out the policy implications. If it's immunized that a company can make a misleading or false statement, it's just a matter of time before they're going to be sold, and they don't make an actual confession, even for years, as counsel noted, and say, okay, we lied about that, that that would immunize them from securities fraud. Otherwise, they could continue to say – they could keep publishing it. Every time there's stock drops, we're going to be sold in two months, or probably not two months. They'd have to be ambiguous. It's just a matter of time. I see your point. But if we have to draw lines, and we have to draw lines, where is the line to be drawn here? I mean, when do we say they lied about it? Do we say that they lied about it a month later, a year later, three years later? Good question, Your Honor. I would say when the market perceives it. And here we've alleged that with particularity what the market perceives by market participants talking about it. And, again, we're just, as Facebook noted, the very early pleading stage. Can we prove this? Well, it's going to be – that's up for the trier of fact. But right now we're at the pleading stage, and this is our theory. Defendants are on notice of it. And these issues that we talked about, whether the statement's public, that's truth on the market. That's a factual issue. Whether the stock went up two cents or three cents and whether there was price impact, that's a factual issue. These are not pleading issues. The loss causation at the pleading stage is confined to whether the plaintiffs have given notice of the loss, and we've done that. And the one thing that the counsel said that I agree with is that our case does not turn – Facebook doesn't change the outcome here. We win under 9B or Rule 8 on loss causation either way, and Facebook doesn't change that analysis. I'm out of time. Thank you, Your Honors. Thank you.
judges: FLETCHER, MENDOZA, Schreier